UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:13cr7 (SRU) |
| ANTHONY PATTERSON | |

### RULING ON MOTION TO SUPPRESS

On November 13, 2012, on I-95 South in Norwalk, Connecticut, Connecticut State Trooper First Class Matthew Funchion stopped a vehicle driven by the defendant, Anthony Patterson.  During the course of the stop, Trooper Funchion recovered a firearm from Patterson's person during a frisk for weapons.  Patterson is a convicted felon and on January 9, 2013, a grand jury returned a one-count indictment charging Patterson with Unlawful Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  *See* Indictment (doc. # 1).

Patterson has moved to suppress the firearm as the product of an unlawful seizure and search (doc. # 19).  A suppression hearing was held on October 1, 2013, and the parties thereafter submitted supplemental briefing.  As set forth below, I find that the initial traffic stop was lawful, because Trooper Funchion had probable cause to believe that Patterson violated Conn. Gen. Stat. § 14-96a(a)(3).  The subsequent the pat down was lawful as well, because Trooper Funchion had reason to believe that Patterson may have been armed and dangerous.[1]  Therefore, the motion to suppress is DENIED.

---

[1] There is some indication in the motion to suppress that statements made by Patterson in connection with the arrest should also be suppressed.  Because I find that the stop and frisk both were lawful and because the video recording of the incident establishes that Patterson was read his Miranda rights before being questioned by the police, there is no basis for suppressing any statements Patterson made at the scene of his arrest.

**I.     Factual Background**

The incident, from approximately one minute before Patterson was pulled over until well after the firearm was recovered, was recorded by the Mobile Video Recorder ("MVR") or "dash cam" in Trooper Funchion's vehicle.  Unless otherwise noted, the following facts are derived from that video recording.

At approximately 12:40 p.m. on November 13, 2012, while on patrol on I-95 South, Trooper Funchion activated the MVR in his vehicle to record the movements of a white 2013 Nissan Altima traveling in the center lane of traffic.  Defendant Anthony Patterson was the driver of the Altima.  At the suppression hearing, Trooper Funchion testified that the Altima initially caught his attention because it appeared to be a rental car and rental cars are more often involved in criminal activity.  Trooper Funchion testified that, before activating the MVR or running the Altima's plates, he pulled up beside the vehicle and observed the driver leaning away from him, which aroused his suspicion.  Trooper Funchion then ran the plates and confirmed that the Altima was a rental car, and also learned that the Norwalk police had run its plates twice on November 9, 2012.  There was no indication that the vehicle was stolen or that it had been pulled over on that date.  Trooper Funchion nevertheless decided to activate the MVR.

The MVR shows Trooper Funchion switch to the left lane and pull in front of the Altima. He then shifts back to the center lane behind the Altima, which immediately turns on its right turn signal.  At the hearing, Trooper Funchion admitted that he pulled in front of the Altima in part to see if the driver would lean away from him again (which Patterson did) and in part to check whether the whether the Altima's headlights were on, because its taillights were not. Trooper Funchion acknowledged that he was looking for a traffic violation to justify pulling over the Altima.  *See* Hr'g Tr. 34:7-40:13; 45:18-46:9, Oct. 1, 2013 (doc. # 39).  At approximately

2

12:41 p.m., Trooper Funchion verbally announces his intent to pull over the Altima "because it is raining out and he doesn't have any headlights on." At the hearing, however, Trooper Funchion acknowledged that his intention in pulling over the vehicle was related more to interdiction than enforcement of the traffic laws. Hr'g Tr. 46:7-9.

At the time the MVR is activated, drops of water are visible on the windshield of Trooper Funchion's police car and it appears to be raining lightly. The police car does not have its windshield wipers on and it is not possible to tell whether other vehicles on the road have their windshield wipers on. Many of the vehicles visible on I-95 North have their headlights on. The MVR does not display whether the southbound vehicles nearby have their headlights on, but the visible southbound vehicles do not appear to have their taillights on. Droplets of water continue to accumulate on the police car's windshield while Trooper Funchion tracks the Altima and the police car's windshield wipers are activated at 12:41:34 p.m., as the Altima is being pulled over.

Before exiting the police car and approaching the Altima, Trooper Funchion comments that the driver is "playing with something in his lap" and that the car is "white-lining" – i.e., it is straddling the white line between the breakdown lane and the right lane of traffic. The MVR confirms the latter statement, but it is not possible to observe Patterson's movements from the recording. Trooper Funchion exits his vehicle and approaches the Altima from the passenger side. He asks Patterson for his license and paperwork, and explains that he pulled him over because he was driving without his headlights on in the rain.

Patterson provides Trooper Funchion with his Connecticut Identification Card and rental agreement, but tells him that he does not have a license and that he is on parole. Although the MVR does not pick up Patterson's statement regarding the nature of his parole, the police report prepared in connection with the arrest indicates that Patterson was on parole at the time for

3

conspiracy to commit murder in 2001. Def.'s Reply Ex., at 3 (doc. # 26-1). Trooper Funchion asks Patterson to move the Altima to the right so that it is fully the breakdown lane. Trooper Funchion then returns to his vehicle.

Trooper Funchion remains in his vehicle for approximately two minutes, and the police report indicates that he is verifying Patterson's criminal history during this time. While in his vehicle, Trooper Funchion remarks that Patterson is "very nervous about going back to jail" and also verbally notes that Patterson's phone is in his lap and he might have been texting. At 12:46:35 p.m., Trooper Funchion exits his vehicle and approaches the driver's side window of the Altima, which is now parked fully in the breakdown lane. He asks Patterson how long he has been renting the Altima and whether there is any contraband in the car, because he noticed Patterson "looking down" when he pulled him over and "fooling around" in his lap. Trooper Funchion then asks Patterson whether he can search the Altima, to make sure there are no "guns and drugs in there."

Patterson agrees to a search of the vehicle and Trooper Funchion instructs him to get out of the car, but to leave his phone in the Altima. Patterson asks Trooper Funchion if he can put his hood up because it is raining, and Trooper Funchion indicates that is fine. At 12:47:56 p.m., Patterson awkwardly steps out of the car with his back toward Trooper Funchion and can be seen moving his left hand around at his waist area before turning sideways and putting his hands on the vehicle. Trooper Funchion then places his hand on his holster and calmly asks Patterson to move to the back of the vehicle and interlock his fingers behind his back. He proceeds to pat down Patterson around his waistband and then immediately pulls Patterson's hands behind his

back and pushes his torso against the vehicle.  Trooper Funchion handcuffs Patterson and recovers a gun from his waistband.[2]

**II.    Discussion**

The Fourth Amendment to the Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "The touchstone of [a court's] analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'"  *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (citing *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).  Reasonableness is determined by balancing the legitimate government interest in law enforcement with "the individual's right to personal security free from arbitrary interference by law officers."  *Id.* at 109 (internal citations omitted); *see also, e.g.*, *United States v. Knights*, 534 U.S. 112, 118-19 (2001).

The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" within the meaning of the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809-10 (1996) (internal citations omitted).  Officers may briefly detain a vehicle and its occupants when they have a reasonable and articulable suspicion of criminal activity.  *Terry*, 392 U.S. at 30. Determining the reasonableness of a *Terry* stop is a two-part inquiry: courts must first determine

---

[2] The MVR recording continues for nearly another hour, and documents the subsequent canine search of the vehicle for narcotics and attendant removal of the Altima's dashboard, as well as the questioning of Patterson after he is read his Miranda rights.  Patterson's post-hearing memorandum (doc. # 36) emphasizes that the contents of the MVR contradict parts of the police report and Trooper Funchion's testimony at the hearing, thereby undermining his credibility.  Because my ruling that the stop and frisk both were lawful is based on the footage from the MVR rather than Trooper Funchion's own justifications, it is not necessary to make a determination about Trooper Funchion's credibility in ruling on this motion.

whether the original stop was warranted, and then determine whether the scope and duration of the investigative detention were reasonable under the circumstances. *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). Even if the stop is lawful, a police officer may not pat down or "frisk" an occupant of the vehicle for weapons unless there is reason to believe he may be armed and dangerous. *Terry*, 392 U.S. at 29; *United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977).

Patterson challenges the initial traffic stop as an unreasonable and therefore unlawful seizure. Patterson also asserts the pat down that uncovered the firearm was an unlawful search.

      A.  <u>Constitutionality of the Vehicle Stop</u>

The Supreme Court has held that the decision to stop an automobile typically is justified "where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810; *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation."). Moreover, the seizure of driver and passengers during a traffic stop "ordinarily . . . remains reasonable, for the duration of the stop." *Johnson*, 555 U.S. at 333. The stop is valid even if the officer's true motive in pulling over the automobile is to search for other criminal activity and the traffic violation is "a mere pretext" to gain access to the vehicle. *Whren*, 517 U.S. at 813. Once a vehicle is lawfully stopped, an officer may order the occupants to step out of the vehicle without any additional suspicion of criminal behavior. *Mimms*, 434 U.S. at 111 (officer may order driver to exit vehicle); *Maryland v. Wilson*, 519 U.S. 408, 408-09 (1997) (extending the *Mimms* rule to passengers). Finally, an officer may inquire "into matters unrelated to the justification for the traffic stop . . . so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333 (citing *Muehler v. Mena*, 544 U.S. 93, 100–01 (2005)).

Although his primary motivation admittedly was interdiction, Trooper Funchion's stated basis for stopping the Altima was Conn. Gen. Stat. § 14-96a(a)(3), which provides: "Every vehicle upon a highway within this state shall display such lighted lamps and illuminating devices as may be required . . . at any time during periods of precipitation, including, but not limited to, periods of snow, rain or fog."  It is undisputed that the Altima did not have its headlights on at the time it was stopped.  Patterson, however, objects to the stop on the grounds that it was not "raining" within the meaning of section 14-96a(a)(3) at the time Trooper Funchion decided to stop the Altima; therefore, he lacked probable cause to believe that a traffic violation had occurred.  As evidence that it was not "raining," Patterson points out that: (1) the police car did not have its windshield wipers on when Trooper Funchion decided to stop the Altima; (2) the other southbound vehicles did not have their taillights on when the Altima was stopped, which indicates that their headlights were not on; and (3) the Altima's lights did not come on automatically, which they did when the car sensed that it was dark enough to require headlights.  Def.'s Br. 5-6 (doc. # 20).

The statute does not define "rain" or "precipitation" or set a threshold amount of "rain" required to constitute a "period of precipitation."  Patterson asserts that the term "rain" should be linked to the use of windshield wipers, because Conn. Gen. Stat. § 14-99f requires the windshield to be kept free from obstructions and because the Driver's Manual issued by the Department of Motor Vehicles ("DMV") states that drivers must turn on their headlights when their windshield wipers are on.  Def.'s. Br. 6 and Ex. A, at 64.  The DMV Manual, however, is not a binding regulation and it does not purport to interpret the term "rain" in section 14-96a(a)(3).  Its direction to turn on one's headlights when one's wipers are on is simply a helpful

7

way to ensure that drivers remember to turn on their lights; it is not a conclusive statement of law regarding windshield wipers or headlights.[3]

Patterson also asks me to infer that it was not raining because virtually none of the other southbound vehicles visible on the MVR appear to have their taillights on, which evidences that their headlights are not on either.[4] Def.'s Br. 5. He recognizes that the behavior of other motorists does not justify illegal behavior, but asserts that "the conduct of other – presumably law-abiding – citizens in the area is relevant to the determination of whether an ordinary person using common sense would believe it was 'raining' and thus necessary to use their headlights." *Id.* The problem with this argument is that traffic laws are strict and mechanical and the behavior of other drivers does not impact the content of the laws. The speed limit on stretches of I-95 South, for example, is 55 miles per hour, but that does not stop the "speed of traffic" from approaching 65 miles per hour or more. But even if no one is driving 55 miles per hour, and even if the realities of the road arguably make it unsafe to drive that slowly, a police officer still has the right to pull over an automobile traveling at 60 miles per hour based on the legally applicable speed limit.

---

[3] Some states do link the operation of headlights during precipitation to the use of windshield wipers. *See, e.g.*, N.Y. Veh. & Traf. Law § 375(2)(a)(1) ("Every motor vehicle except a motorcycle, driven upon a public highway during [a] period . . . when windshield wipers are in use, as a result of rain, sleet, snow, hail or other unfavorable atmospheric condition, and at such other times as visibility for a distance of one thousand feet ahead of such motor vehicle is not clear, shall display . . . at least two lighted head lamps on the front."); Cal. Veh. Code § 24400 (b)-(c) ("A motor vehicle, other than a motorcycle, shall be operated during darkness, or inclement weather, or both, with at least two lighted headlamps . . . . "[I]nclement weather" is a weather condition . . . requiring the windshield wipers to be in continuous use due to rain, mist, snow, fog, or other precipitation or atmospheric moisture."). Presumably, if it intended to link the use of windshield wipers with the use of headlights, the Connecticut Legislature would have written the law to reflect that intent.

[4] Connecticut law requires a vehicle's taillights to be wired to come on whenever its headlights are turned on. Conn. Gen. Stat. § 14-96c(c).

Patterson's argument is also undermined by the fact that many of the northbound vehicles clearly have their headlights on as they pass Trooper Funchion's vehicle. It is not possible to determine from the MVR why northbound vehicles might have had their lights on while southbound vehicles did not. They may have been coming out of a heavier period of rain down the road or they may simply have been more "law-abiding" than southbound vehicles. Either way, this discrepancy between northbound and southbound traffic does not conclusively resolve whether it was "raining."

Finally, the fact that Patterson's lights did not switch on automatically does not bear on whether or not it was raining for the purposes of section 14-96a(a)(3). The traffic stop occurred in the early afternoon and the MVR establishes that it was overcast, but not dark outside. Patterson presents no evidence that the Altima's lights would have turned on automatically in a daytime light rain when his windshield wipers were not on.[5]

The dictionary definition of rain is "water that is condensed from the aqueous vapor in the atmosphere [that] falls to earth in drops more than 1/50 inch (.5 mm) in diameter." Random House Webster's Unabridged Dictionary (2d Ed. 1998). "Precipitation" is "falling products of condensation in the atmosphere, as rain, snow, or hail." *Id*. Drops of water, some of which are small and some of which are large, can be seen collecting on Trooper Funchion's windshield during the relevant period – they are present when he turns on the MVR and continue to accumulate as he monitors the Altima, when he announces his intent to stop the vehicle "because it is raining," and while the Altima is pulled over (at which time the police car's windshield

---

[5] The Nissan website indicates that 2013 Altima sedans had headlights that were designed to "read and react to light conditions outside, automatically turning your lights on and off when needed" and also to "react automatically to your windshield wipers, turning on after four swipes." *See* Nissan Website, http://www.nissanusa.com/ buildyournissan/ vehicle-images/2013/ALT/XGC30NIC041C0/e83391dcc25a23e682a88c49752a1531/Altima-Sedan/2.5-SV/Smart-Auto-Headlights/Exterior (last visited January 29, 2014).

wipers are on).  Based on the definitions of rain and precipitation, and without any guidance from the Connecticut Legislature or Connecticut case law suggesting otherwise, Trooper Funchion had probable cause to believe that Patterson violated section 14-96a(a)(3), because he decided to pull over the Altima during a "period of precipitation" – i.e., light rain.  Even if the stop was primarily conducted for interdiction purposes and even if Trooper Funchion would not have stopped another vehicle for the same infraction, Trooper Funchion remains justified in stopping the Altima because he had probable cause to do so.  That is all the Constitution requires in these circumstances.  *See Whren*, 517 U.S. at 813; *United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1998) ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance.").

      B.  <u>Constitutionality of the Pat Down</u>

In the course of a lawful stop, a police officer may conduct a frisk for weapons if he has reason to believe that the individual stopped is armed and dangerous.  *See, e.g.*, *Oates*, 560 F.2d at 61.  As with the initial stop, the frisk must be based on "specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant [the] intrusion."  *Terry*, 392 U.S. at 21.  Officers are entitled to draw on their "own experience and specialized training to make inferences from and deductions about the cumulative information available to [them] that might well elude an untrained person."  *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

The justification for a frisk is officer safety and the Second Circuit has emphasized that "courts should not set the test of sufficient suspicion that the individual is 'armed and presently dangerous' too high when protection of the investigating officer is at stake."  *United States v. Riggs*, 474 F.2d 699, 705 (2d Cir. 1973); *see also United States v. Oates*, 560 F.2d 45, 63 (2d

Cir. 1977) (quoting *Riggs*). Therefore, although not insignificant, "[t]he requisite level of suspicion is 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Tehrani*, 49 F.3d at 58 (quoting *United States v. Glover*, 957 F.2d 1004, 1007 (2d Cir. 1992) (internal citations omitted)).

Trooper Funchion had reason to believe that Patterson may have been armed and dangerous at the time he conducted the pat down that led to the discovery of the firearm. Trooper Funchion asked Patterson to exit the Altima and to leave his phone in the vehicle. He then opened the door for Patterson. Rather than getting out of the car in a normal fashion, Patterson exited the vehicle backwards and continued standing with his back toward Trooper Funchion while visibly moving his left hand to his waistband area and shifting something around. This behavior alone provided the requisite level of suspicion necessary for a reasonably cautious police officer, patrolling alone and completely exposed on the side of a highway, to conduct a frisk for weapons. Additionally, Trooper Funchion knew that Patterson was on parole for conspiracy to commit murder and that he had a fairly lengthy criminal history. Finally, Trooper Funchion had observed Patterson playing with something in his lap when he first stopped him. Although he initially identified the object as Patterson's phone, at the time Patterson exited the vehicle his phone was in the car and yet his hands still immediately moved to his waistband area.

In short, there was more than enough evidence here to conduct a protective frisk for weapons. Trooper Funchion was justified in conducting the pat down and once he felt an object at Patterson's waist that might have been a firearm, he was entitled to remove it from Patterson's person. *See Oates*, 560 F.2d at 61-62. Both the stop and the frisk were lawful in these circumstances and Patterson's Fourth Amendment rights were not violated.

### III. Conclusion

For the reasons stated above, the motion to suppress (doc. # 19) is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 29th day of January 2014.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge
